# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 7, 2003 Session

## JOHN D. COOKE, III v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C-01-324     Roy B. Morgan, Jr., Judge**

---

**No. W2002-00476-CCA-R3-PC  - Filed June 4, 2003**

---

The petitioner appeals the dismissal of his petition for post-conviction relief, arguing that the post-conviction court erred in finding he received the effective assistance of counsel.  Based on our review, we affirm the order of the post-conviction court dismissing the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, John D. Cooke, III.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; James G. Woodall, District Attorney General; and Angela R. Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On May 20, 1998, the petitioner was convicted by a Madison County Circuit Court jury of unlawful possession of a firearm, aggravated sexual battery, assault, and contributing to the delinquency of a minor, with the latter three offenses based on his abusive relationship with M.J.,[1] an eleven-year-old boy who was in the petitioner's church youth group.  His convictions were affirmed by this court on direct appeal, and his application for permission to appeal to the supreme court was denied.  See State v. John D. Cooke, III, No. W1998-01767-CCA-R3-CD, 1999 WL 1531347 (Tenn. Crim. App. Dec. 28, 1999), perm. to appeal denied (Tenn. 2000).  On August 24, 2001, the petitioner filed a lengthy *pro se* petition for post-conviction relief alleging, among other claims, that he was denied the effective assistance of trial counsel.  The petitioner subsequently

---

[1]It is the policy of this court to refer to minor victims of sexual assault by initials only.

retained post-conviction counsel, who represented him at an evidentiary hearing held on February 6, 2002. The post-conviction court denied the petition at the conclusion of the hearing and, on May 9, 2002, entered a written order dismissing the petition for post-conviction relief. Although the petitioner raised a number of different claims in his *pro se* petition and at the evidentiary hearing, he confines himself on appeal to arguing that the post-conviction court erred in finding that he failed to show he was denied the effective assistance of trial counsel. Specifically, he asserts his trial counsel provided ineffective assistance by their failure to investigate the victim's changing allegations against him and to investigate potential witnesses from Georgia who could have testified that the victim was untruthful and manipulative.

## Trial

The circumstances that precipitated the petitioner's arrest for the crimes were summarized in this court's direct appeal opinion as follows:

> Evidence at trial showed that on February 22, 1995, the [petitioner] was present with the eleven-year old victim, M.J., in the United States District Courtroom in Jackson Tennessee, observing the criminal trial of Robert Smith, the [petitioner's] former employer. Mr. Smith had terminated the [petitioner's] employment, and the [petitioner] had filed a lawsuit against Mr. Smith as a result. The criminal trial had begun the day before, and the [petitioner] and M.J. were present on that date as well. Deputy U.S. Marshall Richard Bateman noticed the two the previous day because they were the only spectators, and on occasions they would be sitting very close together with the [petitioner's] arm around the child and the child's head on the [petitioner's] shoulder. Bateman thought their behavior was "kind of weird," but assumed the two were related. The behavior continued the next day.
>
> On February 22, the second day of the trial, Mr. Smith's attorney, Ed Chandler, approached Bateman, told him that there "was a love affair going on back in the courtroom," and referred to the [petitioner] as a "pedophile." Bateman then discussed the situation with Roger Curry, an FBI Agent who was in the courtroom, and the two of them talked to Judge James D. Todd, the U.S. District Judge presiding over the criminal case. Agent Curry called the Jackson Police Department, which sent two officers out to investigate. After the officers observed the occurrences in the courtroom for a few minutes, Bateman escorted the [petitioner] out of the courtroom, and he was questioned by the police. At trial, Bateman described the conduct between the [petitioner] and M.J. as "unnatural."

Id. at *1.

Judge Todd, Agent Curry, and Investigator Donna Turner also testified at the petitioner's trial, with each describing what he or she witnessed between the petitioner and the victim. Id. at *2. Judge Todd said he noticed the two sitting close together with the petitioner's arm around the victim and the victim "snuggling up to the [petitioner]," behavior which he concluded was "inappropriate" considering that the two were not related. Id. Agent Curry testified he saw the victim on his knees beside the petitioner, the petitioner "nuzzling" the victim in the neck area, appearing to kiss him, and the two laughing and giggling together. Id. Finally, Investigator Turner testified she witnessed the petitioner with his arm around the victim, the petitioner playing with the victim's hair as the victim played with the petitioner's hair, and the petitioner and the victim "embrac[ing] themselves towards each other." Id.

The petitioner told Investigator Turner that he was the youth director at the victim's church in Chattanooga, had permission from the victim's mother and the victim's school to take the victim to attend the Jackson trial, and he and the victim had stayed together in two different Jackson motels the previous two nights. Id. At Investigator Turner's request, the petitioner took her out to his car to retrieve the victim's clothing. In the process, he uncovered a gun in one of the bags, whereupon he announced to Investigator Turner that he had a gun and then obeyed her command to stand back while she retrieved the loaded, semi-automatic pistol from the bag. The petitioner acknowledged he did not have a permit to carry the weapon. Id. at *3.

In both his first interview at the courthouse and in a subsequent interview conducted twelve or thirteen hours later, the victim denied that the petitioner had engaged in any inappropriate contact with him. Id. His account at trial, however, was different, and is set forth in our direct appeal opinion as follows:

> [The victim] said that he met the [petitioner] at church, where the [petitioner] was the Youth Director. At first, M.J. participated in activities at church with other children and the [petitioner], then he started doing things with the [petitioner] alone. . . . M. J. testified that he trusted the [petitioner] "pretty well," but his trust changed because of things the [petitioner] did.
>
> When they arrived in Jackson, the [petitioner] checked into a motel room which had only one bed. M.J. was going to sleep in the chair, but the [petitioner] kept asking him to come over to the bed. He finally got into the bed with the [petitioner], then the [petitioner] began rubbing his penis through his underwear. M.J. ejaculated a little bit into his underwear, which the [petitioner] rinsed out in the sink the next morning. The following night, M.J. got into bed with the [petitioner] because he knew the [petitioner] would not let him sleep in the chair. The [petitioner] then began masturbating M.J. and

himself at the same time. He masturbated M.J. by holding M.J.'s penis in his hand and moving his hand up and down.

During the criminal trial of Smith, the [petitioner] had M.J. sitting very close to him, and he had his arm around M.J. M.J. said that the [petitioner] kept leaning over and "messing with" his ear and his hair. Then, they were taken out of the courtroom and questioned by police officers. M.J. did not tell the police officer what happened because he was ashamed and because he thought he was going to have to ride back home with the [petitioner].

At trial, M.J. was questioned about his background. He testified that when he was a little boy, he believed he had dead Presidents speaking to him, though it was just his imagination. As a result of some of his problems, he was sent to a psychiatric hospital. He was in a program called Northwest Georgia Educational Program for a period of time, and was taking Imipramine. On several occasions, he was expelled from his middle school. His biological father exposed him to pornography and physically abused him. He had sniffed paint and gasoline, but said he was not currently taking any drugs and his brain was not impaired in any way.

Id. at **3-4.

The petitioner took the stand in his own defense at trial, denying that he engaged in any inappropriate contact with the victim or that they had slept in the same bed and claiming that the victim had been "fairly unruly" in the courtroom, which had necessitated the petitioner's having "to make efforts to have M.J. sit still and be attentive." Id. at *4. The petitioner also called the victim's stepfather, Tom White, as a witness on his behalf. White denied he and the victim's mother had attempted to frame the petitioner, but admitted having telephoned the petitioner's mother on numerous occasions to tell her that his wife was trying to frame the petitioner and having repeated the same story to an investigator working for the petitioner's civil attorney. Id. White said he made the false statements out of vindictiveness because he had just gotten out of jail for assaulting his wife and was angry at her at the time. Id.

**Post-Conviction Hearing**

At the post-conviction hearing, the petitioner, who was from Chattanooga, testified that he retained two members of the Madison County bar to represent him on the charges he was facing in

Madison County.[2] The petitioner's main complaint was that trial counsel failed to fully investigate the victim's changing accounts of the events that transpired in the Madison County motel rooms, or to investigate or call important potential witnesses at his trial. The petitioner said he requested copies of his file from both counsel after his conviction and received a copy from one counsel, but his other counsel refused his request. During his review of the numerous documents contained in the file he received, he discovered an important letter, dated October 31, 1995, from James W. Thompson, the assistant district attorney general who prosecuted his case, to Investigator Donna Turner. The body of that letter, which was admitted as an exhibit at the hearing, reads as follows:

> The mother, Kelly Croft, of the victim recently called me and related the victim has told his grandfather he (the victim) was raped by the defendant on the two (2) days preceding the Federal Court incident.

> Please get a new written statement from the victim as to the events that took place in Jackson.

The petitioner said the first time he saw the "Turner memo" was when reviewing his file in preparation for his post-conviction petition. Neither of his trial counsel ever discussed the memo with him, and there was nothing in the file to indicate whether there had been any follow-up on the information it contained. The petitioner explained why he believed the document was important to his case:

> Well, there were no charges in Chattanooga, Tennessee. The child made the same allegation there of rape 21 times in Chattanooga, and I was never arrested or indicted there. The importance of that document is, even though the child's story changed four or five different times in the initial investigation, there had never been an allegation of rape, and, when I saw that document, I realized that the child had come forward nine, ten months down the road, made an allegation that supposedly I had raped him in Madison County, and then we then had additional proof we could ride on showing that that did not happen.

The petitioner testified there was no physical evidence in his case, and the victim's credibility had therefore been a crucial issue at trial. He said he provided trial counsel with a list of Georgia witnesses who could have cast doubt upon the victim's veracity, but trial counsel failed to investigate

---

[2] These two trial counsel were apparently either the second and third, or possibly third and fourth, attorneys the petitioner hired to work on his Madison County case, the petitioner having apparently become unhappy with the representation provided by the attorney or attorneys he first retained. At the same time, the petitioner had also retained Georgia counsel to represent him in connection with similar charges, involving the same victim, that had been brought in a Georgia court. In addition, the petitioner also apparently had civil counsel representing him in connection with a multimillion-dollar civil lawsuit brought against him and his church by the victim's mother on the victim's behalf.

their potential testimony. The petitioner acknowledged that motions requesting that the Georgia witnesses be subpoenaed had been denied by the trial court and that the issue had been raised on direct appeal. He testified, however, that to his knowledge trial counsel never made any attempts to talk to the witnesses to ascertain what testimony they could provide or to ask if they would be willing to come to Tennessee to testify on his behalf. The petitioner said he was unable to interview the witnesses himself because he was subject to a "gag order or a no-contact order in the Walker County, Georgia area" where the victim resided, but he hired an investigator who was able to talk to two of the witnesses, and who had provided him with "some type of report," the findings of which had been sent to trial counsel.

The petitioner expressed his belief that the Georgia witnesses would have made a "critical, major difference in the trial as far as what the jury heard really happened." In support of his claim, he introduced as an exhibit to the hearing the affidavit of Judy Robinson, which states in pertinent part:

> 2. Affiant was a school counselor at the school [M.J.] attended. Affiant had worked with [M.J.] for several years because [M.J.] was a very disturbed/troubled youth who was often in trouble at school.
>
> 3. Affiant, in her personal and professional capacity, found [M.J.] and his mother, Kelli Croft White, to be very manipulative. An unhealthy relationship existed between [M.J.] and his mother, Kelli Croft White, with Ms. White exerting excessive influence on [M.J.'s] actions.
>
> 4. Affiant was a professional school counselor for over eleven (11) years. Affiant would not believe [M.J.] nor Kelli Croft White under oath.

The petitioner stated that another one of the Walker County, Georgia, witnesses, Sharla Green, "had some very, very important information," but did not specify what information she would have provided. He testified he believed trial counsel could have subpoenaed her to testify at his trial because, although she worked in Georgia, her residence was in Tennessee.

On cross-examination, the petitioner acknowledged he maintained "active contact" with both trial counsel and never requested that either one discontinue his representation on his case. He conceded trial counsel were able to bring out the victim's history of hallucinations, drug use, exposure to pornography, and behavioral problems on cross-examination, as well as the fact that he had provided different stories about the incident to police.

Both of the petitioner's trial counsel testified at the evidentiary hearing. The first testified he received his Tennessee law license in 1989, spent one year clerking for a judge on the Tennessee

Court of Criminal Appeals, and had been practicing law since 1990. He said he and co-counsel evenly divided responsibilities on the case; thus, neither had acted as first or second chair. He had no memory of having ever seen the Turner letter, but did not dispute that it was included in the material he sent with the petitioner's file, testifying that the State had an open file policy and he and co-counsel had "on more than one occasion" copied everything that was in the State's file. As for their follow-up on the information in the letter, trial counsel testified he and co-counsel were given access to every interview conducted of the victim, and thus were aware that he had changed his story several times. Counsel said they investigated the multiple interviews conducted of the victim, and he did not know of anything he would have done differently in that respect.

Trial counsel explained why he never personally contacted any of the potential Georgia witnesses:

> We were, you know, prohibited from doing that by the Court in the case from the standpoint of motions we filed asking to be able to subpoena these people. The Court denied that motion and, in addition, made a ruling that it was the Court's opinion that those witnesses would not be permitted to testify based on the information that they were going to be provided. In other words, the Court asked at the hearing what is it these people are going to say, and based on what the Court was told, the Court expressed that it was not going to consider that to be admissible at his trial anyway.

Trial counsel testified, further, that he and co-counsel "felt there were other manners or other methods that [they] could bring out most, if not all, of this same information that [the petitioner] was trying to get in through a witness out of Georgia." Trial counsel said he and co-counsel cross-examined the victim about his background and history and the conflicting statements he had given to police. He conceded they did not cross-examine the victim about his rape allegation referenced in the Turner letter, but said he would have been concerned about having such a serious allegation introduced before the jury.

The petitioner's second trial counsel, who said he had been an attorney since December 17, 1981, testified he had not seen the Turner letter but had seen "the law enforcement handwritten note that encompasse[d] what[]" was in the letter, which had been furnished to him by the petitioner, through his original attorney. Trial counsel was confident he and co-counsel discussed with the petitioner the assertions contained in the letter, including specifically what the victim's grandfather would say about the victim's assertions. To trial counsel's knowledge, no rape kit was ever performed on the victim.

Trial counsel testified he could not, ethically, contact the Georgia witnesses and explained why:

Two reasons. Number one, Judge LaFon had already ruled on that matter either two or three times. Number two, each of those witnesses was represented by civil counsel who had instructed each of those witnesses not to speak to anyone about any of the assertions made by the child or [the petitioner's] relationship with the child or otherwise. So without going through that attorney to obtain that permission, which we both understood was not going to be forthcoming, it was ethically impossible for me to contact somebody else's client and talk to them without that person's permission, and the way that I learned that was actually interviewing, I believe it was, Ms. Green or one of the witnesses at which time I found out that they had been instructed not to speak with us.

Trial counsel said he never sought permission from the Georgia witnesses' attorneys to speak to their clients, but believed that the petitioner's civil lawyer had done so. However, he could not recall if any depositions were taken from the witnesses for the civil lawsuit.

The petitioner, recalled as a rebuttal witness, denied having furnished trial counsel with the handwritten notes relating to the information contained in the Turner letter.

The last witness at the hearing was James W. Thompson, the assistant district attorney who prosecuted the petitioner's Madison County case. He testified he could not recall the specifics surrounding the letter he had written to Investigator Turner or whether she had followed through with an investigation. He said, however, that if the victim had given another statement to Investigator Turner it would have been in his file, which was made available to the petitioner's counsel.

## ANALYSIS

### I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

## II. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient, and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner contends trial counsel provided ineffective representation by failing to investigate the Georgia witnesses or the information contained in the Turner letter. Citing the affidavit of Judy Robinson, the petitioner asserts that the Georgia witnesses "could testify that M.J. is untruthful and manipulative" and that his mother "is a manipulative snake that shouldn't be trusted under oath." He argues Robinson's affidavit demonstrates that at least one of the Georgia witnesses was willing to testify on his behalf, and trial counsel, at the very least, should have investigated what testimony the Georgia witnesses could have provided or whether they had given depositions in the civil case. In a similar vein, the petitioner argues that the Turner letter "would have presented an

extreme break from previous statements made by M.J." and, thus, should have been investigated by trial counsel as a means for casting further doubt upon the victim's credibility at trial.

The post-conviction court concluded that the petitioner failed to meet his burden of proving ineffective assistance of trial counsel, finding, *inter alia*, that trial counsel "made tactical decisions in an effort to provide the best defense for Petitioner and there is no proof that counsel was ineffective in their assistance." The record fully supports the findings and conclusions of the post-conviction court. The petitioner has failed to show either a deficiency in counsel's performance for failing to investigate the potential Georgia witnesses or the Turner letter, or resulting prejudice to his case based on counsel's alleged deficiency in representation.

The petitioner testified at the post-conviction hearing that he provided trial counsel with a list of Georgia witnesses who could have offered testimony to show the victim's deceitful and manipulative nature. In support, he offered the affidavit of school counselor Judy Robinson, who stated that the victim was a troubled/disturbed youth and that she would not believe either the victim or his mother under oath. However, trial counsel testified that the trial court had denied their motions to subpoena the Georgia witnesses. Further, each of the witnesses was represented by counsel who had instructed them not to speak with the petitioner's trial counsel, and the trial court had ruled that it would not allow the witnesses' testimony if they appeared in court. Therefore, trial counsel cannot be considered deficient for failing to contact or interview witnesses whose testimony the trial court had already ruled would not be allowed at trial.

Moreover, even if the petitioner had succeeded in showing trial counsel were deficient by not investigating the Georgia witnesses or obtaining their presence at his trial, he failed to show how that alleged deficiency prejudiced the outcome of his case. The essential information Judy Robinson provided in her affidavit, that the victim was a disturbed youth with behavioral problems, was effectively brought out through trial counsel's cross-examination of the victim, who acknowledged his behavioral problems, drug use, exposure to pornography, history of hallucinations, and the different accounts of the incident he had offered to police. As for Sharla Green, although the petitioner asserted she had "very, very important information," he did not offer her testimony at the post-conviction hearing to show what favorable testimony she would have presented at his trial. Thus, there was no basis from which the post-conviction court could determine that her failure to testify prejudiced the petitioner's case. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.").

The petitioner also contends trial counsel were ineffective for failing to investigate the information contained in the Turner letter, arguing that the victim's "extreme break" from the nature of his allegations contained in his previous statements demonstrated his lack of credibility. However, the petitioner has not shown either a deficiency in counsel's performance or resulting prejudice with respect to this claim. Trial counsel's testimony established that they fully investigated and reviewed the various statements given by the victim, and that the decision not to introduce

evidence of the victim's subsequent rape allegation was tactical, based on a desire to keep the jury from hearing about an allegation involving a much more serious offense than those with which the petitioner was charged in the instant trial. When evaluating a claim of ineffective assistance, we must indulge a strong presumption that the conduct of counsel fell within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Here, there is no proof that counsel were anything but fully prepared for the petitioner's trial. We conclude, therefore, that the petitioner has failed to show he was denied the effective assistance of trial counsel.

## CONCLUSION

Having reviewed the record, we conclude that the post-conviction court did not err in finding the petitioner failed to meet his burden of demonstrating ineffective assistance of counsel. Accordingly, we affirm the post-conviction court's dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-11-